## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **TRINIDAD CHAVIRA &** | ) |
| **KATHY SERRANO,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) Case No.: |
| | ) **JURY TRIAL DEMANDED** |
| **PACKERS SANITATION SERVICES,** | ) |
| **INC., LTD.** | ) |
| Serve: | ) |
| National Registered Agents, Inc. of KS | ) |
| 112 SW 7th Street, Suite 3C | ) |
| Topeka, Kansas 66603, | ) |
| | ) |
| **Defendant.** | ) |

_____

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION, HARASSMENT & RETALIATION IN VIOLATION OF TITLE VII & SECTION 1981 & RETALIATORY DISCHARGE PROHIBITED BY THE KANSAS COMMON LAW & VIOLATIONS OF THE FAIR LABOR STANDARDS ACT & THE KANSAS WAGE PAYMENT ACT

**COME NOW** Plaintiffs Trinidad Chavira and Kathy Serrano (collectively "Plaintiffs") and for their cause of action against Packers Sanitation Services, Inc., Ltd., and states as follows:

### PARTIES

1. Trinidad Chavira resides at 227 S. Webster Ave., Liberal, Kansas. She is Hispanic female.

2. Kathy Serrano resides at 120 W. Coolidge St., Liberal, Kansas. She is Hispanic female. Ms. Serrano is also a widow.

3. At all relevant times, Ms. Chavira and Ms. Serrano were full-time employees of Packers Sanitation Services, Inc., Ltd. ("PSSI") and worked at the National Beef plant in Liberal, Kansas.

4.      PSSI is an Ohio corporation that provides sanitation services to processing plants in the food industry.

5.      PSSI has over 15,000 employees and is an employer within the meaning of Title VII, Section 1981, the Fair Labor Standards Act ("FLSA") and the Kansas Wage Payment Act ("KWPA").

## JURISDICTION & VENUE

6.      Plaintiffs' Complaint against PSSI is brought pursuant to Title VII and Section 1981 based on the discriminatory, harassing and retaliatory conduct of Defendant's employees, supervisors, and managers and the failure of PSSI to properly investigate, address and remedy illegal sex and race discrimination, harassment and retaliation in the workplace.  Plaintiffs have also asserted wage and hour violations pursuant to the FLSA.  As such, this Court has original jurisdiction over Plaintiffs' Title VII, Section 1981 and FLSA claims pursuant to 28 U.S.C. § 1331.

7.      Venue in this District is proper pursuant to 28 U.S.C. § 1391 because PSSI operates within this District and a substantial part of the unlawful conduct giving rise to Plaintiffs' claims occurred in this District.

8.      This Complaint is also brought pursuant to the KWPA and the Kansas common law.  This Court has supplemental jurisdiction over Plaintiffs' state law claims because the state law claims form part of the same case or controversy under Article III of the Constitution and derive from a common nucleus of operative facts such that they would be expected to be tried in one judicial proceeding.

9.      On or about July 27, 2016, Ms. Chavira filed her initial "Charge of Discrimination" ("Charge") in a timely manner with the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC") based on her race and sex discrimination,

harassment and retaliation claims.  The EEOC Charge number is 563-2016-01867.  A copy of the EEOC Charge is attached hereto as **Exhibit A.**

10.     On or about July 27, 2016, Ms. Serrano filed her initial "Charge of Discrimination" ("Charge") in a timely manner with the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC") based on her race and sex discrimination, harassment and retaliation claims.  The EEOC Charge number is 563-2016-01873.  A copy of the EEOC Charge is attached hereto as **Exhibit B.**

11.     On or about March 10, 2017, the EEOC issued Ms. Chavira her "Right to Sue" ("RTS") letter.  This lawsuit is brought within ninety (90) days of the date of the RTS letter. (A copy of the RTS letter is attached as **Exhibit C).**

12.     On or about March 10, 2017, the EEOC issued Ms. Serrano her "Right to Sue" ("RTS") letter.  This lawsuit is brought within ninety (90) days of the date of the RTS letter. (A copy of the RTS letter is attached as **Exhibit D).**

13.     All requisite conditions to this Court having jurisdiction over PSSI and Plaintiffs' claims are met.

## GENERAL ALLEGATIONS

### Kathy Serrano

14.     On or about October 10, 2015, Ms. Serrano began work for PSSI as a sanitation worker at the National Beef plant in Liberal, Kansas.  Ms. Serrano began work on the night shift.

15.     In November 2015, at her request, Ms. Serrano was transferred to the day shift.

16.     A large percentage of the PSSI workers at the National Beef plant are Hispanic females.

17.     Esteban "Chiquilin" Esparza was Ms. Serrano's direct supervisor while she worked on the day shift.

18.     Ms. Serrano reported for her first day and Mr. Esparza assigned her to clean the freezers.  Ms. Serrano was dressed in light clothes that day and Mr. Esparza asked if she had heavier clothes.  Ms. Serrano advised that she did and said she would go change in heavier clothes.

19.     Mr. Esparza said not to change in the female locker room and instead, demanded that Ms. Serrano change in front of him.

20.     Mr. Esparza stared at Ms. Serrano the entire time she changed her clothes.  She felt very uncomfortable and quickly left Mr. Esparza's office after changing.

21.     Three days later, Ms. Serrano was having a work-related conversation with Mr. Esparza when her daughter, Elizabeth, came up as a topic of conversation.

22.     Mr. Esparza asked Ms. Serrano if she wanted him to be Elizabeth's daddy.

23.     Ms. Serrano answered, "No."

24.     Mr. Esparza asked, "Why not, don't you think I'm attractive?"

25.     Ms. Serrano replied, "No.  I came to work and am not looking for a man" and removed herself from the conversation.

26.     Approximately a week later, during another work-related conversation, Mr. Esparza asked Ms. Serrano whether she had a boyfriend and whether wanted to go out on a date with him.

27.     Ms. Serrano answered, "No."

28.     Mr. Esparza then continued, "What, you don't like me?"

29.     Ms. Serrano answered, "No."

30.     Shortly after Ms. Serrano declined to go on a date with Esparza, he called her into his office and threatened her by saying, "If you are not going to give me a piece of ass you need to do your job."

31.     Ms. Serrano told Mr. Esparza that she did her job well and she was there to work and would not give Mr. Esparza "a piece of ass".

32.     Immediately thereafter, the harassment by Esparza increased.

33.     Mr. Esparza would monitor Ms. Serrano's whereabouts and stand outside of the restroom while she was in there.  He questioned Ms. Serrano about the number of restroom breaks she took.

34.     Mr. Esparza also moved Ms. Serrano to a less desirable position of picking up all of the animal fat in the plant.  This is one of the worst positions in the plant.

35.     Mr. Esparza increased Ms. Serrano's hours and refused to compensate her from the extra hours worked.

36.     Ms. Serrano complained to Ernesto "Nestor" Ramirez about the sexual harassment by Mr. Esparza and his refusal to pay her for the additional hours worked.

37.     Mr. Ramirez reprimanded Ms. Serrano for making a sexual harassment complaint and told her that she should not discuss that kind of stuff inside of the plant and to deal with it outside of the plant.

38.     After Ms. Serrano complained to Mr. Ramirez, the harassment by Mr. Esparza escalated.

39.     At one point, Mr. Esparza blocked Ms. Serrano in a restroom and would not let her exit.

40.     After the bathroom incident, Ms. Serrano complained to PSSI Area Manager, Hector Saenz, who was Mr. Ramirez' boss.

41.     Mr. Saenz failed to address the situation with Mr. Ramirez and Mr. Esparza and instead, retaliated against Ms. Serrano by moving her to the "B" shift (nights).

42.     Ms. Serrano explained to Mr. Saenz that she was a single mother and if she worked nights she will have to hire someone to care for her children.

43.     Mr. Saenz refused to explore other alternatives (including disciplining Mr. Esparza and Mr. Ramirez) and permanently assigned Ms. Serrano to the night shift.

44.     While working the night shift, Ms. Serrano was again assigned to pick up animal fat on the kill floor.

45.     While at work one night, Ms. Serrano was struck by large animal bones falling from overhead.  The impact caused Ms. Serrano to sustain injuries.

46.     Ms. Serrano's night supervisor refused Ms. Serrano's reasonable request to see the plant nurse.

47.     Ms. Serrano asked her night supervisor to be moved to a different position because of her injury.

48.     Ms. Serrano's night supervisor refused to move Ms. Serrano to a different position.

49.     Instead, Ms. Serrano's night supervisor made comments about the "crazy lady" at the plan and her "attorneys."  These comments were directed at both Ms. Serrano and Ms. Chavira for seeking legal counsel.

50.     In response to those comments, Ms. Serrano asked her night supervisor to leave her alone.

**Trinidad Chivara**

51.    On or about February 1, 2016, Ms. Chavira began working for PSSI as a sanitation worker at the National Beef plant in Liberal, Kansas.

52.    Ms. Chavira's direct supervisor was Mr. Esparza.

53.    Ms. Chavira noticed that Mr. Esparza treated female employees different than male employees and abused his power.

54.    Ms. Chavira saw Mr. Esparza hug female employees and rub their shoulders.

55.    Mr. Esparza would not give Ms. Chavira a regular schedule.

56.    Mr. Esparza bragged to Ms. Chavira that he controlled the time clock.

57.    Mr. Esparza did not allow Ms. Chavira to use the time clock until the second or third week on the job.

58.    Ms. Chavira complained to Mr. Esparza about getting paid with an ATM card because it did not even have her name on it.

59.    In response to Ms. Chavira's complaint about the ATM card, Mr. Esparza said, "I didn't think you were that smart."

60.    Shortly after Ms. Chavira began working for PSSI, Mr. Esparza sent a text message to Ms. Chavira's husband, a National Beef supervisor, and threatened to remove Ms. Chavira from her position unless he was paid.

61.    Ms. Chavira refused Mr. Esparza's demand for money.

62.    Mr. Esparza threatened to remove Ms. Chavira from her position a second time unless he was paid.

63.    Ms. Chavira again refused Mr. Esparza's demand for money.

64.     Mr. Esparza made good on his promise to remove Ms. Chavira from her position and transferred her to a more physically demanding position that required her to grease the overhead chains.

65.     In order to grease the overhead chains, Ms. Chavira had to keep her arms extended for the entire day.

66.     On or about February 22, 2016, Ms. Chavira injured her shoulders, neck and back after greasing the chains for the entire day.

67.     Ms. Chavira promptly notified Mr. Esparza of her occupational injury, but he ignored her and walked away.

68.     The next day, Ms. Chavira messaged Mr. Esparza and stated that she would not be at work that day due to her injuries from the previous day.

69.     Ms. Chavira also asked a co-worker to remind Mr. Esparza that she had taken the day off.

70.     Ms. Chavira returned to work on February 24, 2016.  Upon her return, Mr. Esparza called Ms. Chavira into the office and berated her for missing work the previous day.

71.     Ms. Chavira told Mr. Esparza that she sent him a message about her absence and also asked a co-worker to remind him that she had taken the day off.

72.     Mr. Esparza claimed he did not receive the message and was not otherwise made aware of Ms. Chavira's absence.

73.     Mr. Esparza told Ms. Chavira that he was issuing her a written reprimand and that she would have to report to PSSI Area Manager Hector Saenz.

74.     Ms. Chavira went to see Mr. Saenz, but she had to wait outside for several hours.

75.     While waiting, Ms. Chavira heard Mr. Saenz and Mr. Esparza arguing.

76.     Mr. Esparza made a comment to the effect of, "If I want her to sit in my office and look pretty that is what she will do."

77.     When Ms. Chavira was finally met with Mr. Saenz, she told him that Mr. Esparza had threatened to remove her from her position unless he was paid and that she had given proper notice regarding her absence.

78.     Mr. Saenz admitted that he was aware that supervisors demanded money in exchange for favorable positions.  Mr. Saenz also said that is how it had always been at PSSI.

79.     Mr. Saenz told Ms. Chavira that he was not going to terminate her employment and he transferred her back to her original positon.

80.     Ms. Chavira worked in her original position for a few days before Mr. Esparza found out and transferred her to a more physically demanding position that required her to clean restrooms and locker rooms.

81.     Cleaning the restrooms and locker rooms exacerbated Ms. Chavira's injuries.

82.     One day, while Ms. Chavira was cleaning the restroom, Mr. Esparza sent Vanessa Martinez, a female supervisor, into the restroom to proposition Ms. Chavira.

83.     Ms. Martinez cornered Ms. Chavira in the restroom and said, "You know what you have to do if you want to get an easier job."

84.     Ms. Chavira knew that Ms. Martinez meant that she had to have sexual intercourse with Mr. Esparza and she told Ms. Martinez that was a "big offense."

85.     Ms. Chavira walked out of the restroom and Mr. Esparza was standing outside of the door.

86.     Mr. Esparza did not say anything to Ms. Chavira, but he smiled, winked at her and walked away.

87.     Throughout the remainder of Ms. Chavira's employment, Mr. Esparza's harassment of her increased.  He followed Ms. Chavira around the National Beef plant and had female supervisors pull her out of the restroom so he could verbally abuse her.  One time, Esparza told Ms. Chavira that she was a "no one."  Mr. Esparza also used National Beef employees to spy on Ms. Chavira.  Ms. Chavira heard these conversations over the radio.

88.     Ms. Chavira complained to Mr. Saenz that Mr. Esparza was still harassing her, but Mr. Saenz took no corrective action or otherwise protected Ms. Chavira.  Mr. Saenz attempted to justify Mr. Esparza's behavior by stating that Mr. Esparza was "difficult to work with."

89.      On or about March 23, 2016, Ms. Chavira was terminated for rebuffing Mr. Esparza's sexual advances and for complaining about sexual harassment and extortion in the workplace.

90.     Ms. Chavira made a report to the Liberal Police about Mr. Esparza's illegal behavior of extorting money and sexually harassing her.

**Additional Wage Issues – All Plaintiffs**

91.     PSSI pays employees by putting money on an ATM card.

92.     There is no way to see the balance on the ATM card without calling the number on the back.

93.     Employees are charged a fee when they use the ATM card.

94.     Plaintiffs were not given pay stubs on a regular basis.

95.     Plaintiffs were not able to clock in for all shifts.

96.     PSSI has not provided a working time clock for all shifts worked by Plaintiffs.

97.     Plaintiffs were denied their pay stubs when they requested them.

98.     Plaintiffs have not been compensated for all hours worked up to forty hours per week.

99.     Plaintiffs have not been compensated at time and a half for all hours worked in excess of forty hours per week.

## COUNT I – RETALIATORY DISCHARGE FOR BLOWING THE WHISTLE ON A SUPERIOR IN VIOLATION OF THE KANSAS COMMON LAW

### Plaintiff Chavira

100.    Plaintiff Chavira reasserts and re-alleges the allegations set forth in paragraphs 1 through 99 as if fully set forth herein.

101.    The acts described above constitute retaliatory discharge for blowing the whistle on a superior in violation of Kansas law.

102.    Ms. Chavira believed, and any reasonably prudent person in her position would have believed, that Mr. Esparza's practice of exercising his authority and power over her and demanding money in exchange for a good position amounted to extortion prohibited by K.S.A. 21-3701(c).

103.    Ms. Chavira complained to Mr. Saenz, Mr. Esparza's supervisor, that Mr. Esparza was exerting his power and authority over her and demanding money in exchange for a good position.

104.    Mr. Saenz admitted that he was aware that this illegal practice had occurred, but made no effort to investigate Ms. Chavira's complaints or take proper corrective action.

105.    Ms. Chavira made a report to the Liberal Police Department regarding Mr. Esparza's extortion, among other things.

106.    After Ms. Chavira complained to Mr. Saenz and the Liberal Police Department she was discharged.

107.   There is a casual connection between Ms. Chavira's whistleblowing activities and her resulting discharge.

108.   As a direct and proximate result of Ms. Chavira's discharge, she suffered damages in the form of lost income and other benefits.

109.   Ms. Chavira suffered great emotional upset due to the fact that she was being harassed for blowing the whistle on her superior.  She was upset, frequently stressed, lost sleep, could not focus at work and was constantly worried about what else would happen to her at work, including termination of her employment.

110.   The act of harassing and terminating Ms. Chavira for reporting a serious violation of law constitutes malice or a reckless indifference to Ms. Chavira's rights.

**WHEREFORE**, Ms. Chavira prays for judgment against Defendant on Count I of her Complaint, for a finding that she has been subjected to an unlawful retaliatory discharge prohibited by Kansas law; for an award of compensatory and punitive damages; for interest; and for such other and further relief as the Court deems just and proper.

## COUNT II – QUID PRO QUO SEXUAL HARASSMENT IN VIOLATION OF TITLE VII

### All Plaintiffs

111.   Plaintiffs reassert and re-allege the allegations set forth in paragraphs 1 through 110 as if fully set forth herein.

112.   The acts described above amount to quid pro quo sexual harassment.

113.   Upon information and belief, PSSI management knew that Mr. Esparza had sexually harassed other female employees.  Despite this knowledge, Mr. Esparza continued to be employed as a supervisor.

114.    Mr. Esparza abused his power as a supervisor and propositioned female employees for sexual acts in exchange for desirable positions within the plant.

115.    Mr. Esparza made sexual advances towards Ms. Serrano by asking her: 1) if she wanted to go out on a date with him, 2) whether she liked him, 3) whether she found him attractive 4) whether she wanted him to be her daughter's daddy and 5) if she would give him a "piece of ass".   Mr. Esparza also abused his power and sexually exploited Ms. Serrano by making her undress and change her clothing in front of him.

116.    Mr. Esparza made sexual advances towards Ms. Chavira by directing Ms. Martinez to ask Ms. Chavira in the restroom whether she would have sexual relations with Mr. Esparza in exchange for a better position.

117.    Plaintiffs rebuffed Mr. Esparza's advances

118.    Mr. Esparza used Plaintiffs' rejection as the basis for harassing them and keeping them in positions he knew they did not want.

119.    The act of requesting sexual acts in exchange for better positions within the plant constitutes malice or a reckless indifference to Plaintiffs' protected rights.

**WHEREFORE**, Plaintiffs pray for judgment on Count II of their Complaint; for a finding that they have been subjected to unlawful quid pro quo harassment in violation of Title VII; for an award of back pay, including fringe benefits, bonuses, cost of living increases and other benefits, including interest; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; for their costs expended; for their reasonable attorneys' and expert's fees and expenses; and for such other and further relief as the Court deems just and proper.

### COUNT III – SEX DISCRIMINATION & HARASSMENT IN VIOLATION OF TITLE VII

**All Plaintiffs**

120.    Plaintiffs reassert and re-allege the allegations set forth in paragraphs 1 through 119 as if fully set forth herein.

121.    The acts described above amount to sex discrimination and harassment in violation of Title VII.

122.    Plaintiffs belong to a protected class based on their sex, which is female.

123.    Mr. Esparza treated Plaintiffs, and other female employees, differently than males. Plaintiffs did not witness Mr. Esparza mistreat a male employee. However, when it came to female employees, Mr. Esparza requested sexual acts from Plaintiffs; made Plaintiff Serrano undress and change clothes in front of him; hugged female employees; rubbed female employees' shoulders; moved Plaintiffs to less desirable positions when they would not comply with his demands; ordered the Plaintiffs around and berated them; monitored Plaintiffs' whereabouts; used National Beef employees spy on Ms. Chavira;  refused to allow Ms. Chavira to use the time clock and told her that he controlled the time clock, refused to give Ms. Chavira a schedule; refused to provide employees with their check stubs; wrote Ms. Chavira up for an absence that she had reported; told Ms. Chavira that he did not think she was very smart and was a "no one;"  bragged to other PSSI supervisors that he could make Ms. Chavira sit in his office and look pretty if he wanted to; and he told Ms. Serrano that she had better do her job since she was not going to give him a "piece of ass".

124.    Plaintiffs were subjected to numerous and adverse damaging employment actions including, but not limited to, being removed from their original positions and placed in positions that were more physically demanding and less desirable; writing Ms. Chavira up for an absence that she had reported; terminating Ms. Chavira's employment; and moving Ms. Serrano to the

night shift which impacted her ability to mother her children and caused her to incur additional child care expenses.

125.    A casual connection exists between Plaintiffs' sex and the adverse employment actions they experienced.

126.    Plaintiffs suffered great emotional upset due to the fact that they were discriminated against based on her sex.  They were frequently upset, stressed, lost sleep, could not focus at work and were constantly worried about what else would happen at work, including termination.

127.    The act of treating Plaintiffs differently based on their sex constitutes malice or a reckless indifference to Plaintiffs' protected rights.

**WHEREFORE,** Plaintiffs pray for judgment against Defendant on Count III of their Complaint, for a finding that they have been subjected to unlawful sex discrimination and harassment prohibited by Title VII; for an award of back pay, including fringe benefits, bonuses, cost of living increases and other benefits including interest; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; for their costs expended; for their reasonable attorneys' and expert fees and expenses, and for such other and further relief the Court deems just and proper.

## COUNT IV – RACE DISCRIMINATION & HARASSMENT IN VIOLATION OF TITLE VII, & SECTION 1981

### All Plaintiffs

128.    Plaintiffs reassert and re-allege the allegations set forth in paragraphs 1 through 127 as if fully set forth herein.

129.    The acts described above amount to race discrimination and harassment in violation of Title VII and Section 1981.

130.    Plaintiffs belong to a protected class based on their race, which is Hispanic.

131.     PSSI managers and supervisors knew that Hispanic employees who worked in the National Beef plant in Liberal were treated as second class citizens.  It was known within PSSI that supervisors extorted money from Hispanic employees (including Ms. Chavira) in exchange for better positions within the plant.  Hispanic employees were exploited and required to work long hours without proper pay.  Hispanic employees were not provided with proper documentation such as pay stubs.

132.     Plaintiffs worked in dangerous and physically demanding positions and, on at least one occasion, a PSSI supervisor told Ms. Serrano that she could not see the plant nurse after she was injured by falling animal bones.  Another supervisor ignored Ms. Serrano after she tried to report an occupational injury.

133.     The discriminatory and harassing conduct described above was motivated by a racial animus towards Hispanics.

134.     Plaintiffs were subjected to numerous and adverse damaging employment actions including, but not limited to, being removed from their original positions and placed in less desirable positions; being reprimanded and written; being placed on the night shift and being terminated from employment.

135.     A casual connection exists between Plaintiffs' race and the adverse employment actions Plaintiffs experienced.

136.     Plaintiffs suffered great emotional upset due to the fact that they were discriminated against based on their race.  They were frequently upset, stressed, lost sleep, could not focus at work and were constantly worried about what else would happen to them at work, including termination of their employment.

137.    The act of treating Plaintiffs differently based on their race constitutes malice or a reckless indifference towards Plaintiffs' protected rights.

**WHEREFORE,** Plaintiffs pray for judgment against Defendant on Count IV of their Complaint, for a finding that they have been subjected to unlawful race discrimination and harassment prohibited by Title VII, and Section 1981; for an award of back pay, including fringe benefits, bonuses, cost of living increases and other benefits including interest; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; for their costs expended; for their reasonable attorneys' and expert fees and expenses, and for such other and further relief the Court deems just and proper.

## COUNT V – RETALIATION IN VIOLATION OF TITLE VII & SECTION 1981

### All Plaintiffs

138.    Plaintiffs reassert and re-allege the allegations set forth in paragraphs 1 through 137 as if fully set forth herein.

139.    The acts described above constitute retaliation in violation of Title VII and Section 1981.

140.    Ms. Chavira engaged in protected opposition to discrimination when she complained to Mr. Saenz about Mr. Esparza's discriminatory treatment of her and when she told Ms. Martinez that requesting a sexual act in exchange for a good position was a "big offense."

141.    Ms. Serrano engaged in protected opposition to discrimination when she complained to Mr. Ramirez and Mr. Saenz that she was being sexually harassed by Mr. Esparza. She also engaged in protected opposition to discrimination when she filed her Charge.

142.    After Plaintiffs complained about Mr. Esparza they were reprimanded for making complaints.  Ms. Serrano was told to address her sexual harassment complaint outside of the

workplace.  Plaintiffs were also removed from their positions and placed in positions that were dangerous and/or more physically demanding.  Ms. Serrano was transferred to the night shift which impacted her ability to mother her children and caused her to incur childcare expenses.  Ms. Chavira was written up and terminated.  The harassment of Plaintiffs by Mr. Esparza also increased after their complaints.  Ms. Serrano's night supervisor, made comments about the "crazy lady" and "attorneys," in direct reference to her and Ms. Chavira.  Ms. Serrano's night supervisor would not allow Ms. Serrano to see the nurse after being injured and would not transfer her to a less dangerous position.

143.    There is a causal connection between Plaintiffs' complaints and the adverse actions that followed.

144.    Plaintiffs suffered great emotional upset due to the fact that they were retaliated against for making good faith reports of harassment and discrimination.  Plaintiffs were frequently upset, stressed, lost sleep, could not focus at work and were constantly worried about what else would happen at work, including termination of their employment.

145.    The act of retaliating against Plaintiffs based on good faith complaints of discrimination and harassment constitutes malice or a reckless indifference to Plaintiffs' protected rights.

**WHEREFORE,** Plaintiffs pray for judgment against Defendant on Count V of their Complaint, for a finding that they have been subjected to unlawful retaliation prohibited by Title VII and Section 1981; for an award of back pay, including fringe benefits, bonuses, cost of living increases and other benefits including interest; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; for their costs expended; for their reasonable

attorneys' and expert fees and expenses, and for such other and further relief the Court deems just and proper.

## COUNT VI – VIOLATIONS OF THE FLSA AND KWPA

### All Plaintiffs

146.    Plaintiffs reassert and re-allege the allegations set forth in paragraphs 1 through 145 as if fully set forth herein.

147.    Defendant violated the FLSA and the KWPA by failing to pay Plaintiffs all wages that were due and owing as required by statute.

148.    The FLSA and the KWPA require each covered employer, including Defendant, to compensate all non-exempt employees for all hours worked and to compensate them at a rate of not less than one and one-half the regular rate of pay for all work performed in excess of the applicable overtime threshold.

149.    Plaintiffs were non-exempt hourly employees throughout their employment with Defendant.

150.    Plaintiffs performed sanitation work at the National beef plant and were not compensated for all hours worked.

151.    At times, Plaintiffs were not able to clock in and their hours were not properly recorded by Defendant while they performed their sanitation duties.  Plaintiffs were not given pay stubs and were paid on ATM cards that did no show the number of hours Plaintiffs worked or their rate of pay.

152.    Defendant knew Plaintiffs performed sanitation work that was not properly recorded and/or performed work in excess of the applicable overtime threshold.

153.    Defendant's failure to pay Plaintiffs was willful.

154.    Upon information and belief, Defendant failed and refused to keep proper records of hours and failed to have a properly working time clock on the premises to avoid paying regular and overtime compensation due under the FLSA and the KWPA.

WHEREFORE, Plaintiffs pray for judgment against Defendant on Count VI, for a finding that Defendant violated the FLSA and the KWPA; for a proper accounting; for an award of regular and overtime wages for all hours worked; for statutory penalties; for liquidated damages; for punitive damages; for their costs expended; for their reasonable attorneys' and expert fees and expenses, and for such other and further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all issues triable by jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas as the place for trial.

Respectfully Submitted,

**WILLIAMS DIRKS DAMERON LLC**

/s/ Michael A. Williams
Michael A. Williams, KS Bar No. 19124
1100 Main Street, Suite 2600
Kansas City, MO 64105
mwilliams@williamsdirks.com
(o) 816-876-2600
(f) 816-221-8763

**KUHLMAN & LUCAS, LLC**

/s/ Matthew J. Wengert
Matthew J. Wengert, KS Bar No. 24733
1100 Main Street, Suite 2550
Kansas City, MO 64105
matt@kuhlmanlucas.com
(o) 816-799-0330

(f)  816-799-0336

**Attorneys for Plaintiffs**